IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| JASAAN ALLAH QIYDAAR | * | |
| v. | * | Civil No. ELH-17-1622 |
| PEOPLE ENCOURAGING PEOPLE, INC. | * | |

******

**MEMORANDUM OPINION**

Plaintiff Jasaan Allah Qiydaar, who is self represented, instituted suit against defendant People Encouraging People, Inc. ("PEP"), seeking both damages and injunctive relief for unlawful suspension, transfer, and discharge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. ("Title VII"). ECF 1.[1] Defendant's motion for summary judgment is now pending. ECF 14. It is supported by two exhibits. Plaintiff opposes the motion (ECF 16), and has submitted numerous exhibits. PEP has replied. ECF 17.

The parties have fully briefed the issues, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons set forth below, the Motion shall be granted in part and denied in part.

## I.    Factual Summary

### A.  Background

Qiydaar is an African-American resident of Baltimore, Maryland who was employed by PEP from May 2015 to May 2016. ECF 16-1, ¶¶ 1-2; ECF 16-31. PEP is a privately owned non-profit behavioral healthcare corporation based in Baltimore, which provides rehabilitation and

---

[1] This case was originally assigned to Judge J. Frederick Motz. It was reassigned to me on April 30, 2018. *See* Docket.

support services to disadvantaged and disabled individuals at various locations throughout Maryland. ECF 14-1, ¶ 3.

Relations between Qiydaar and PEP began to sour in December 2015, after the parties discussed the possibility of Qiydaar receiving a promotion for which he was ultimately passed over. ECF 14-1, ¶ 5; ECF 16-1, ¶¶ 5, 6. Qiydaar alleges that PEP offered him the promotion but then rescinded that offer. ECF 16-1, ¶¶ 5, 6. The position was offered instead to another African-American male employee. ECF 14-1, ¶ 5. Qiydaar claims that in the months following this decision there was increasing racial tension at PEP. ECF 16-1, ¶¶ 9-10.

The tension came to a head during a staff meeting held on March 16, 2016. ECF 14-1, ¶ 7; ECF 16-1, ¶ 11. Although the parties dispute the specifics of what occurred at that staff meeting, they agree on certain basic facts: Qiydaar said he was not available to help with a particular task after which a white employee cursed at him in front of PEP's Director of Human Resources, Terry Bennington. ECF 14-1, ¶ 7; ECF 16-1, ¶¶ 11-15.

### B.  Qiydaar's Initial Complaints

Qiydaar believed that Bennington's response to the incident was inadequate, but consistent with the demeaning treatment he had been receiving for months, so he complained to PEP's Chief Executive Officer, Dale Meyer, via email the next day. ECF 16-1, ¶¶ 12, 16-18. In the email of March 17, 2016, Qiydaar said that he could not "remain silent any longer" in light of the events of the preceding day. ECF 16-3. He complained that a generally hostile work environment had developed in which he had been harassed, intimidated, micromanaged, demeaned, threatened with termination, excessively monitored, criticized, disrespected, and devalued. *Id.*

According to plaintiff, two groups had developed within PEP, "one which is comprised of non-African-American staff which makes all the major decisions regarding our program; and another, which is comprised of African-American staff that receives marching orders and threats of termination." *Id.* Qiydaar claimed that "allowing specific colleagues to publicly mistreat other colleagues further undermines the integrity and cohesiveness of the . . . program." *Id.* Therefore, he asked Meyer to "use the power of [her] position to address the inappropriate behavior that has created such a hostile work environment." *Id.*

On the morning of Tuesday, March 22, 2016, Qiydaar met with Bennington and PEP Vice President Michelle Weaver-Johns. ECF 1, ¶ 23; ECF 16-17. The meeting ended in a manner unsatisfactory to Qiydaar, who claims that Bennington and Weaver-Johns made "several excuses" on behalf of the employee who had cursed at him and complained for the first time that some of Qiydaar's previous conduct had made another employee uncomfortable. ECF 16-17. Although Bennington promised to speak with Qiydaar's white colleagues and then follow up with him, she did not do so. ECF 1, ¶ 23.

That afternoon, Qiydaar spoke out again at a staff meeting about the disparity in treatment between employees of different races. ECF 1, ¶ 23. Certain of Qiydaar's African-American colleagues also complained at this meeting, and Qiydaar corroborated the factual bases for their complaints. ECF 1, ¶ 23; ECF 16-17.

**C. Requests for Qiydaar's Weekly Schedule and Qiydaar's Continued Complaints**

On Friday, March 18, 2016, PEP Intake Specialist Veronica Craig sent Qiydaar an email asking him to list his job duties in a responsive email by noon on Monday, March 21, 2016. ECF 16-1, ¶ 26. Although Qiydaar did not immediately respond, he did so when reminded. *Id.* Qiydaar then received permission to go on vacation on Thursday, March 24, 2016 and Friday,

March 25, 2016. ECF 16-1, ¶ 27. On Thursday, March 24, 2016, Craig sent an email to numerous individuals, including Qiydaar, stating: "Please submit your weekly schedule for the week of March 28, 2016 by 5 pm Friday March 25, 2016. The schedule should include all client appointments, home visits, transportation schedules and any other times you are away from the building." ECF 14-1 at 14. Because Qiydaar was out of the office, he did not submit his schedule. ECF 16-1, ¶¶ 28-29.

On Monday, March 28, 2016, Qiydaar returned to work and, having heard nothing from Meyer about his complaint, submitted a formal incident report regarding the March 16th incident to PEP Vice President Stephen Palla. ECF 16-1, ¶ 22; ECF 16-4. The incident report stated: "On Wednesday, March 16, 2016 I was verbally harassed and assaulted by Katie Glen at our regularly scheduled TAY[2] team meeting. During my conversation with another colleague (Lisa Meyer Coco), Ms. Glen inserted herself into the discussion. Ms. Glen was very aggressive and used profanity when she addressed me." ECF 16-4.

Craig sent an email to Qiydaar and two other individuals on Tuesday, March 29, stating: "Please submit your detailed schedule for this week to me by 12 noon today." ECF 14-1 at 15. Qiydaar did not submit his schedule, however. ECF 14-1, ¶ 10. He claims he failed to do so because a staff meeting at PEP headquarters "kept [him] away from [his] office for most of the day." ECF 16-1, ¶ 31.

On Wednesday, March 30, still having heard nothing from Meyer or Palla about his complaints, Qiydaar sent an email to Bennington, copying both Meyer and Palla. ECF 16-17. Qiydaar complained about the lack of response to his disparate treatment claims and about what he believed to be the fabricated complaint that he had made another employee "uncomfortable."

---

[2] It appears that "TAY" is an abbreviation for PEP's Transitional Age Youth program.

*Id.* Qiydaar requested a follow-up meeting to discuss his hostile work environment complaint, an unbiased investigation into the March 16th incident, and an apology from the employee who had cursed at him. *Id.*

On Thursday, March 31, Craig sent an email to Bennington, stating: "Jasaan Qiydaar did not turn in his weekly schedule. I received schedules from everyone else." ECF 14-1 at 16. In turn, Bennington sent Qiydaar an email that said: "Good morning as of today I have not received your schedule as Veronica requested on 3/24/16 and again on 3/29/2016. I will need your schedule by 1:00 today so that I can complete [a] task I need to do for my job." ECF 14-1 at 18. Later that same day, Craig sent an email to numerous individuals, including Qiydaar, stating: "Please submit your weekly schedule for the week of April 4, 2016 by noon Friday April 1, 2016." ECF 14-1 at 17.

On Friday, April 1, 2016, at 5:44 p.m., Qiydaar emailed a weekly schedule to Bennington. ECF 16-6. Qiydaar explained that he had been out of work on March 24th and 25th and offsite on March 29th, and claimed he had just received the most recent request for his schedule. *Id.* He also mentioned that although he had texted Bennington the previous day and seen her twice that day, she had not mentioned anything about needing his schedule. *Id.* He expressed the belief that PEP was requesting his schedule and making it difficult to comply with the request as pretext to retaliate against him for complaining about the racially hostile work environment. *Id.*

### D. **Qiydaar's Suspension**

On Monday, April 4, 2016, Bennington sent Qiydaar an email stating that Qiydaar's failure to submit his weekly schedule as requested was "viewed as a refusal to provide it, constituting insubordination." ECF 14-1 at 19. Bennington acknowledged that Qiydaar had sent

her a schedule on Friday, April 1 at 5:44 P.M., along with excuses for the delay, but explained

why the excuses were deficient and noted that the schedule was "incomplete." *Id.* "In closing,"

Bennington stated, *id.* at 20:

> [B]y failing and refusing to provide your work schedule with dates, times, and
> client names of all appointments to me for two (2) months, you have been
> insubordinate. I have not asked you to do anything that your co-workers have not
> been asked to do, and have done. Because you have continued to be insubordinate
> despite numerous requests to comply, you are hereby suspended without pay until
> you provide me a complete and accurate schedule with time, date, and other
> needed client information.

Although the email stated that Qiydaar had not submitted his schedules for almost two

months, PEP provided no evidence of this fact. Qiydaar claims that the weekly schedule

submission policy was invented for the first time on March 24, 2016. ECF 16-1, ¶¶ 27-30; ECF

21. When PEP was asked to identify any schedule submission policy that was in place prior to

March 24, 2016, it was unable to do so. ECF 19. Instead, it pointed to two isolated emails, one

sent on February 4, 2016 and the other on February 8, 2016. They asked Qiydaar and one other

employee to submit "client contact notes." ECF 20 at 6-7.

Beginning Monday, April 4, 2016, Qiydaar repeatedly reached out to Bennington via

text, asking her for updates on the status of his suspension. ECF 16-19 at 1. On Friday, April 8,

Bennington finally responded, telling Qiydaar that his suspension would continue as long as she

did not receive from him the necessary information regarding his work schedule. *Id.* Qiydaar

responded, asking her to "please specify what information . . . and I will do my best to submit it

. . . ." *Id.* Bennington never did so. *Id.* Qiydaar continued to text Bennington, without any

response. *Id.*

Qiydaar emailed Meyer on Monday, April 11, 2016, asking for an update on the status of

his suspension. *Id.* Meyer never responded. *Id.* Qiydaar continued to reach out to both

Bennington and Meyer daily, until Thursday, April 14, 2016, at which point Bennington texted

Qiydaar: "You still have not complied with the documentation requested. Thank you." *Id.*

Qiydaar responded, *id.* at 1-2:

> On 4/7/2016 I asked you to specify what was requested . . . you did not respond so I attempted to reach out to you several times on 4/8/2016 . . . . At the end of the day you stated you would contact me on 4/9/2016 but you did not . . . . [A] week later I'm still awaiting an explanation of what you're requiring me to do [to] end this unlawful "indefinite suspension without pay" . . . . Unfortunately this suspension has been extended because you and the CEO have chosen to ignore my daily requests for an update on my employment status . . . . Please specify what's being asked of me . . . .

On Sunday, April 17, Bennington informed Qiydaar that he needed to include client

names on his schedule in order to be released from his suspension. ECF 16 at 9. Qiydaar claims

that as soon as Bennington related that information, he submitted an updated weekly schedule

with client names. ECF 16-9. PEP neither confirms nor denies this claim.

### E.  Qiydaar's Transfer

On Monday, April 18, 2016, Bennington sent Qiydaar a letter notifying him that he was

being transferred to a new position at a different PEP office. ECF 14-1 at 21. Bennington stated

that the new position was comparable to his old position and that he would be paid the same

salary and receive the same benefits. The letter stated: "This change is being made because of the

insurgency you demonstrated while employed in the Transitional Age Youth program, having

been unwilling to produce schedules required to track your activities." *Id.* PEP claims that it

could have terminated Qiydaar at this point, but chose to transfer him in order to give him a

"clean slate" at a different location. ECF 14 at 9.

Qiydaar sent an email to Bennington on Friday, April 22, complaining about the transfer.

ECF 16-21. He expressed the view that he was being transferred to a position that was "quite

obviously <u>not</u> comparable" to his old position, in retaliation for complaining about the racially hostile work environment at PEP. *Id.*

## F.  Qiydaar's Absences

On Monday, April 25, 2016, Qiydaar reported for his first day of work at the new site. ECF 14 at 10. That morning Qiydaar was informed that he would no longer be working with young adults. ECF 16 at 9. He left work after lunch and did not return that day. *Id.* Qiydaar's supervisor at the new site, Shakena Doss Mabry, issued Qiydaar a written Disciplinary Notice for leaving work without permission and not returning. ECF 14-1 at 22. Qiydaar explained: "I left for lunch, ran an important errand, then went and picked up my children. I had every intention of getting back to the site, but time did not permit." *Id.* The next day Qiydaar showed up for work but left, claiming he was sick. ECF 14-2 at 2. He did not return to work on Tuesday, April 26. *Id.* On Wednesday, April 27, Qiydaar called Mabry to inform her that he was still sick. ECF 16 at 9. In response, Mabry informed Qiydaar that he needed to provide a doctor's note if he planned to be out sick beyond the next day. *See* ECF 14-1 at 29. Qiydaar called out sick for the rest of the week, without a doctor's note.

On Friday, April 29, 2016, Mabry informed Bennington and Meyer: "Jasaan called out sick today. This is day 4. He is aware he needs a doctor's note to return. I asked him if he had an ETA of when he will return. He stated that he does not have an ETA of when he will return however he will keep me posted." ECF 14-1 at 30.

Qiydaar called out sick again on Monday, May 2, 2016. Mabry informed Bennington and Meyer: "Jasaan Q is out sick today for the 5th consecutive day." *Id.* at 31. Qiydaar called out sick again on both Tuesday, May 3 and Wednesday, May 4. Then, on May 4, Mabry informed Bennington and Meyer: "Jasaan called ou[t] sick again today and stated that he would not be able

to provide the requested medical documentation by the requested 9 am time frame . . . ." *Id.* at 32. Qiydaar disputes this assertion, claiming that he told Mabry he had a doctor's appointment scheduled for Tuesday, May 10 and that he would keep her updated in the meantime. ECF 16 at 9.

### G. **Qiydaar's Discharge**

On Thursday, May 5, 2016, Qiydaar received a letter from Bennington stating that he was being discharged effective the next day, based on his extended unexcused absence. ECF 16-31. The letter stated, *id.*:

> You have not worked since April 26, 2016 at which time you stated that you could not work due to illness. Your supervisor on April 28, 2016 requested a doctor's note for your absence and an expected return date. As of today May 5, 2016, you have still not provided a return date nor have you provided a doctor's note, as requested several times. Under Company policy, employees who are out due to illness for more than three days are required to provide a doctor's note to justify the absence.

On June 14, 2017, Qiydaar filed the complaint in this case. ECF 1. On December 19, 2017, PEP filed a motion for summary judgment. ECF 14. On May 4, 2018, the Court requested supplemental briefing regarding this Motion. ECF 19. The parties submitted such briefing, ECF 20 (PEP); ECF 21 (plaintiff). The Motion is now ripe for review.

### II. **Standard Of Review**

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see Iraq*

*Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004). The court

must "view the evidence in the light most favorable to ... the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Moreover, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323–24).

### III.  Discussion

### A.

Qiydaar's Complaint contains only one count**.**  It alleges both discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964. ECF 1. Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1); *see Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal–Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).  It also prohibits an employer from retaliating against an employee because the employee filed a grievance or complaint regarding an employment practice that allegedly violated Title VII's antidiscrimination provision.  *See* 42 U.S.C. § 2000e-3(a); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 415 (4th Cir. 2015).

Different elements are required to establish a prima facie case of discrimination than are required to establish a prima facie case of retaliation. *Compare Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) *with Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012).  But, Title VII race discrimination and Title VII retaliation are both assessed according to the standards set forth below. *See Guessous*, 828 F.3d at 216 (stating that the same "framework applies in employment discrimination and retaliation cases").

At trial, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *accord Price Waterhouse v. Hopkins*, 490 U.S. 228, 246 (1989).  With regard to proof of intentional discrimination, "[a]s in

any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983); *accord Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003). "Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation omitted); *see also Black's Law Dictionary*, "Direct Evidence" (10th ed. 2014) ("Evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

In the absence of direct evidence of discrimination, a plaintiff in a Title VII case may use the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. *See Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (retaliation case). Put another way, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

In other words, there are "two avenues" *at trial* by which a plaintiff may prove a violation of Title VII. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc) (recognized in *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015), as abrogated on other grounds by *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Young v. United Parcel*

*Serv., Inc.*, ___ U.S. ___, 135 S. Ct. 1338, 1345 (2015) (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the three steps of the *McDonnell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

A plaintiff who chooses to proceed at trial under the *McDonnell Douglas* approach must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the

*McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove 'both that the reason was false, and that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the methods by which a plaintiff may prove

intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court recognized that the *McDonnell Douglas* proof scheme "is an evidentiary standard, not a pleading requirement." Nevertheless, the *McDonnell Douglas* proof scheme has some utility at the summary judgment stage. *See Pettis v. Nottoway Cnty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) ("Where, as here, a plaintiff does not allege direct evidence of discrimination, a plaintiff asserting racial discrimination may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . ."); *Stokes v. Va. Dep't of Corr.*, 512 F. App'x 281, 282 (4th Cir. 2013) (per curiam) (reviewing award of summary judgment and stating, "Absent direct evidence of intentional discrimination, claims under Title VII are analyzed under the burden-shifting framework established in *McDonnell Douglas* . . . .").

## B. Title VII Discrimination

Title VII states, in part: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). The "intentional discrimination provision [of Title VII] prohibits certain *motives*, regardless of the state of the actor's knowledge." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, ____U.S. ____, 135 S. Ct. 2028, 2033 (2015) (emphasis in original). And, if "an employer offers a facially legitimate reason for its decision", but the plaintiff can show that the employer's "explanation was just a pretext for discrimination", then the employer is liable under Title VII. *Ricci v. DeStafano*, 557 U.S. 557, 596 (2009).

To establish a prima facie case of discrimination, a plaintiff must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman*, 626 F.3d at 190 (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)); *accord Gerner v. Cnty. of Chesterfield, Va.*, 674 F.3d 264, 266 (4th Cir. 2012).

As indicated, "the existence of some adverse employment action is required" for a plaintiff to prevail on a Title VII discrimination claim. *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Disparate treatment occurs when an employer has treated an employee "'less favorably than others because of' a protected trait." *Ricci*, 557 U.S. at 577 (citation omitted). In a disparate treatment case, the plaintiff must establish "'that the defendant had a discriminatory intent or motive' for taking a job related action." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (citation omitted); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000) ("The ultimate question in every disparate treatment case is whether the plaintiff was the victim of intentional discrimination."). "Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.'" *Raytheon Co.*, 540 U.S. at 52 (2003).

To be sure, Qiydaar, an African-American, is a member of a protected class. Moreover, Qiydaar was subjected to three separate employment actions that he alleges were materially

adverse: suspension without pay, transfer, and discharge. Suspension without pay and discharge are clearly adverse employment actions. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as . . . firing . . . .").

The court will assume, *arguendo*, that Qiydaar can establish all of the elements of a prima facie case of Title VII discrimination. *See, e.g., Holland*, 487 F.3d at 218; *Hux v. City of Newport News, Va.*, 451 F.3d 311, 314 (4th Cir. 2006). Therefore, the burden shifts to PEP to show a valid, nondiscriminatory reason for its decision to subject Qiydaar to these three adverse employment actions.

PEP has articulated a nondiscriminatory basis for all three adverse employment actions. Specifically, it says Qiydaar was (1) suspended without pay for being "insubordinate" by "failing and refusing to provide [his] work schedule with dates, times, and client names of all appointments," ECF 14-1 at 20, (2) transferred "because of the insurgency [he] demonstrated" by continuing to be "unwilling to produce schedules required to track [his] activities." ECF 14-1 at 21, and (3) discharged because on his first day after being transferred he left work and did not return for the next two weeks. ECF 16-31.

Therefore, the burden shifts back to Qiydaar to demonstrate that these reasons were a mere pretext for race discrimination. To do so, he must prove "*both* that the reason was false, *and* that discrimination was the real reason." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (internal citation omitted). Qiydaar cannot discharge this burden, because no reasonable jury could find that discrimination was the real reason for any of these three adverse employment actions.

"[T]he plaintiff cannot seek to expose that rationale as pretextual by focusing on minor

discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a genuine dispute, the latter would fail to be material." *Holland*, 487 F.3d at 216 (internal quotations omitted). Rather, to show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or "'unworthy of credence,'" *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Burdine*, 450 U.S. at 256), and that discrimination was the true reason for the adverse employment action. *Hicks*, 509 U.S. at 515 (plaintiff must prove "*both* that the reason was false, *and* that discrimination was the real reason") (emphasis in *Hicks)*; *accord Adams*, 640 F.3d at 560.

When the question at issue is whether the "'decision maker'" acted with discriminatory animus, only the "'perception of the decision maker'" is "'relevant'" to the question. *Hux*, 451 F.3d at 319 (citation omitted). Indeed, "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson,* 264 F.Supp.2d 314, 329 (D. Md. 2003). In assessing a defendant's proffered reasons, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (brackets omitted) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation and internal quotation marks omitted)).

Qiydaar offers a handful of allegations in the Complaint that he believes suggests racial animus on the part of PEP employees. Specifically, he claims that Bennington told him a white colleague "wasn't used to being questioned," because "she's a professional." ECF 1, ¶ 21. He points out that the white colleague who cursed at him was not suspended or terminated for doing

so. *Id.* at ¶ 30. And, he alleges that Meyer used racial slurs during a meeting with him in November 2015. *Id.* at ¶ 49. Even assuming the truth of each of these allegations, only the third allegation suggests racial animus on the part of a PEP employee. There is nothing racially suggestive about Bennington's comment, and Qiydaar offers no reason to believe PEP's decision about how to handle the colleague who cursed at him was racially motivated. The use of racial slurs, on the other hand, if true, suggests clear racial animus.

However, the timeline of events belies the notion that Meyer's racial animus was the real reason Qiydaar was subjected to adverse employment actions. Notably, it was Meyer who hired Qiydaar in May 2015. And "[t]he fact that the employee was hired and fired by the same person within a relatively short time span . . . creates a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). Indeed, "[f]rom the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." *Id.* at 797. As a result, "employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Id.* at 798. Although *Proud* referred only to firing, this "same actor inference" applies equally to other adverse employment actions. *See, e.g., Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

Moreover, although Meyer allegedly uttered racial slurs in November 2015, it was not until after Qiydaar complained about the racially hostile work environment at PEP in March 2016 that he was subjected to adverse employment actions: suspension and transfer in April 2016, and discharge in May 2016. This timeline of events is consistent with the true gist of Qiydaar's complaint, which is that he was subjected to adverse employment actions not *because he is African-American*, but *because he complained* about the general mistreatment of African-

Americans at PEP. In short, because no reasonable jury could find that the true reason Qiydaar suffered adverse employment actions was his race, PEP is entitled to summary judgment on Qidyaar's Title VII discrimination claim.

### C. Title VII Retaliation

Qiydaar alleges that he was retaliated against for complaining about the racially hostile work environment at PEP.

To state a prima facie case of retaliation, plaintiff must aver that: (1) he engaged in protected activity; (2) the employer took an adverse action against him[3]; and (3) the protected activity and the adverse action were causally connected. *See Boyer-Liberto*, 786 F.3d at 281; *Stennis v. Bowie State Univ.*, 716 Fed. App'x 164, 166 (4th Cir. 2017 (per curiam); *Guessous, LLC*, 828 F.3d at 217; *Love–Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004); *A Society Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011).

Title VII's anti-retaliation provision "is broader than the anti-discrimination provision in at least two respects." *Strothers v. City of Laurel, Md.*, ___ F.3d ___, 2018 WL 3321317, at *4 (4th Cir. July 6, 2018). First, "[t]he antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington N. and Santa Fe Ry Co. v. White*, 548 U.S. 53, 67 (2007). Of import, "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Id.* at 63 (emphasis in original). Therefore, retaliatory actions need not "affect the terms and conditions of employment" to fall within Title VII's prohibition. *Id.* at 64. But, in a

---

[3] As the Fourth Circuit recently noted in *Strothers v. City of Laurel, Md.*, ___ F.3d ___, 2018 WL 3321317, at n.3 (4th Cir. July 6, 2018), an "adverse employment action" is not the standard in a retaliation case. In other words, the adverse action "need not be employment or workplace–related in order to sustain a retaliation claim." *Id.* (citing, *inter alia*, *Lettieri v. Equant Inc.,* 478 F.3d 640, 650 n.2 (4th Cir. 2007).

retaliation case, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (internal quotations and citations omitted); *see also Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (same).

Second, "the anti-retaliation provision protects employees even when they complain of actions that are not actually unlawful under Title VII." *Strothers*, 2018 WL 3321317, at *4. Therefore, "complaining employees are protected if, at the time of their complaint, they 'have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress.'" *Id.* (citation omitted).

In a retaliation claim, "a 'protected activity' may fall into two categories[:] opposition and participation." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceedings under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). "To fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass formal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted).

Of import, "[t]o establish a causal connection between a protected activity and an adverse action, a plaintiff must prove that the protected activity preceded the adverse action and that the employer knew the employee engaged in a protected activity." *Gibson v. Marjack Co.*, 718 F.

Supp. 2d 649, 655 (D. Md. 2010) (citing *Causey v. Balog*, 162 F.3d 795, 803-04 (4th Cir. 1998));

*see also Dowe*, 145 F.3d at 657; *cf. Conrad v. CSX Transp., Inc.*, WMN-13-3730, 2014 WL

7184747, at *4 (D. Md. Dec. 15, 2014), *aff'd*, 824 F.3d 103 (4th Cir. May 25, 2016).

Ordinarily, there must exist "some degree of temporal proximity to suggest a causal

connection." *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 501 (4th

Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the

protected activity and the alleged adverse ... action'" often "'negates any inference that a causal

connection exists between the two.'" *Id.* (citation omitted). And, "a lapse of as little as two

months between the protected activity and an adverse employment action is 'sufficiently long so

as to weaken significantly the inference of causation.'" *Clarke,* 962 F. Supp. 2d at 790 (quoting

*King v. Rumsfeld,* 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *see Wilcoxon v. DECO Recovery*

*Mgmt., LLC*, 925 F. Supp. 2d 725, 732 (D. Md. 2013) (concluding that four months between the

protected activity and alleged retaliatory conduct did not establish "temporal proximity"). In

"cases where 'temporal proximity between protected activity and allegedly retaliatory conduct is

missing, courts may look to the intervening period for other evidence of retaliatory animus.'"

*Lettieri v. Equant, Inc.,* 478 F.3d 640, 650 (4th Cir. 2007) (citation omitted).

Qiydaar can establish the first element of a prima facie case of retaliation. "Employees

engage in protected oppositional activity when . . . they complain to their superiors about

suspected violations of Title VII," *id.* (internal citation omitted), and Qiydaar complained about

an alleged racially hostile work environment at PEP—a suspected violation of Title VII—on no

less than three occasions.

First, on March 17, 2016, Qiydaar sent an email to his superiors complaining that a

hostile work environment had developed in which he had been harassed, intimidated,

micromanaged, demeaned, threatened with termination, excessively monitored, criticized, disrespected, and devalued based on his race. ECF 16-3. He complained that two groups had developed within PEP, "one which is comprised of non-African-American staff which makes all the major decisions regarding our program; and another, which is comprised of African-American staff that receives marching orders and threats of termination." *Id.* Second, on March 22, 2016, Qiydaar spoke out at a staff meeting about the disparity in treatment between employees of different races. ECF 1, ¶ 23. Certain of Qiydaar's African-American colleagues also complained at this meeting, and Qiydaar corroborated the factual bases for their complaints. *Id.* Third, on March 30, 2016, Qiydaar sent an email to his superiors complaining about the lack of response to his disparate treatment claims. ECF 16-17. Qiydaar requested a follow up meeting to discuss, among other things, his hostile work environment complaint. *Id.* Thus, Qiydaar can establish that he engaged in Title VII protected activity on each of these three occasions.

To satisfy the second element of a retaliation claim, the plaintiff must show that he suffered an "adverse action." *See Strothers*, 2018 WL 3321317, at *5; *A Society Without A Name*, 655 F.3d at 350. Unlike a substantive discrimination claim, the adverse action element of Title VII's antiretaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. and Santa Fe Ry. Co.*, 548 U.S. at 64. Rather, as noted, the adverse action component can be satisfied by showing that the employer took "materially adverse" action in response to an employee engaging in protected activity, "'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (internal quotations and citations omitted). *See also Williams v. Prince William Co., Va.*, 645 F. App'x 243, 244-45 (4th Cir. 2016) (per curiam).

As to the third element, there must ordinarily be "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005); *Nnadozie v. Genesis Healthcare Corp.*, ___ F. App'x ___, 2018 WL 1830935, at *7 (4th Cir. April 17, 2018). Thus, "[a] lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two." *Constantine*, 411 F.3d at 501 (internal quotation marks and citation omitted). Absent temporal proximity between the protected activity and alleged retaliation, the court "may look to the intervening period for other evidence of retaliatory animus." *Lettieri*, 478 F.3d at 650 (internal quotation marks and citation omitted). The plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362.

Qiydaar can also establish the "adverse action" element of a prima facie case of retaliation. As indicated, "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co.*, 548 U.S. at 68. A reasonable jury could find that all three employment actions suffered by Qiydaar were materially adverse for purposes of a Title VII retaliation claim.

First, PEP suspended Qiydaar without pay. ECF 14-1 at 20. The Supreme Court has held that a reasonable jury can find a suspension without pay materially adverse. *See Burlington Northern*, 548 U.S. at 73 ("[A]n indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay . . . ."). Second, PEP transferred Qiydaar to a position at a different location where he would no longer work with children. ECF

16 at 9. "In the context of job reassignment allegations . . . the Supreme Court has stated that, although a job reassignment is 'not automatically actionable,' it may be 'materially adverse depending upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Williams*, 645 F. App'x at 245 (quoting *Burlington Northern*, 548 U.S. at 71). "While changes to the terms, conditions, or benefits of the plaintiff's employment are factors to be considered when evaluating 'all the circumstances,' the lack of such changes is not dispositive on the adverse action component of a retaliation claim." *Id.* "Therefore, all circumstances indicating that an action was harmful and materially adverse to the employee should be considered." *Id.*

PEP focuses on the fact that Qiydaar's rate of pay was unchanged post-transfer. ECF 14 at 16. Although this fact is relevant, it is not dispositive. In light of Qiydaar's background working with young adults and the fact that he worked with young adults prior to his transfer, ECF 1, ¶ 6; ECF 16 at 5, a reasonable jury could find that a transfer to a new position where he could no longer work with young adults was materially adverse.

Third, PEP discharged Qiydaar. ECF 16-31. Termination is certainly an adverse action, not only in the discrimination context, *see Burlington Indus., Inc.*, 524 U.S. at 761, but also in the retaliation context, where the standard for adversity is easier to meet. *See Burlington Northern*, 548 U.S. at 64. Thus, a reasonable jury could find that Qiydaar suffered three separate adverse actions at the hands of PEP.

Qiydaar can also establish the third element of a prima facie case of retaliation, by demonstrating a causal link between his protected activity and these adverse actions. "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Nassar*, 570 U.S. at 352. PEP argues that even had Qiydaar not engaged in

protected activity, it would have suspended, then transferred, and ultimately discharged him, based solely on his failure to perform his job duties adequately. More specifically, PEP claims Qiydaar was both suspended and transferred because he failed to submit weekly work schedules as requested, ECF 14-1 at 20-21, and because of his extended, unexcused absence. ECF 16-31.

There is a genuine dispute regarding whether Qiydaar would have been suspended and then transferred had he not engaged in protected activity. Indeed, PEP has offered no evidence of a weekly schedule submission policy. After making repeated reference to such a policy in its submissions, *see, e.g.*, ECF 14 at 7, 13, 14, 18, 19; ECF 14-1, ¶¶ 8-15; ECF 17 at 3, 4, 6, 8, 11, the Court asked PEP to produce evidence of the policy. ECF 19. It failed to do so, instead bringing to the Court's attention two emails, neither of which demonstrates the existence of a weekly schedule submission policy. ECF 20. Thus, it remains possible that, as Qiydaar argues, ECF 21 at 1, PEP invented a schedule submission policy and then made it intentionally difficult for Qiydaar to comply with that policy out of a desire to retaliate against him for engaging in protected activity.

The record contains competing affidavits disputing whether that is what occurred here. *Compare* ECF 14-1 *with* ECF 16-1. Under such circumstances, summary judgment is inappropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249.

And, because Qiydaar was not discharged until after he was transferred, there is also a genuine dispute as to whether he would have been discharged had he not engaged in protected activity. Unhappy with having been transferred, Qiydaar left work in the middle of his first day at his new job site and did not return. ECF 16 at 9. He then failed to attend work for the next two weeks, claiming he was sick. *See* ECF 14-1 at 29-32; ECF 14-2 at 2; ECF 16 at 9. Even if such conduct would typically provide PEP with a reason to discharge Qiydaar, the fact that this

conduct was prompted by Qiydaar's dissatisfaction with his potentially retaliatory transfer raises a genuine dispute as to whether he would have been discharged had he not engaged in protected activity. Without having determined whether Qiydaar's transfer was retaliatory, the Court cannot resolve this dispute as a matter of law.

Moreover, if Qiydaar were ill, as he claims, it is not clear that he would be in a position to indicate precisely when he would be able to return to work.  Nor is it clear why he would need a doctor's note before he actually was able to return to work, given that the date would probably be unknown. And, someone who is feeling ill may not be in a position to arrange for a doctor's note.

Because Qiydaar can establish a prima facie case of retaliation, the burden shifts to PEP to offer legitimate, non-retaliatory, reasons for suspending, transferring, and discharging him. *See Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015). PEP offers such reasons: it claims it both suspended and transferred Qiydaar because he failed to submit weekly schedules as requested, ECF 14-1 at 20-21, and discharged him because of his extended unexcused absence.  ECF 16-31.

Therefore, the burden shifts back to Qiydaar to raise a genuine issue as to whether these explanations were a mere pretext for unlawful retaliation. *See Foster*, 787 F.3d at 250. He has done so. Indeed, for those reasons discussed above, a reasonable jury could find by a preponderance of the evidence that PEP's true motivation for suspending, transferring, and discharging Qiydaar was to retaliate against him for opposing discrimination, rather than to punish him for failing to submit weekly schedules or attend work. Thus, PEP is not entitled to summary judgment on Qiydaar's Title VII retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment shall be granted in part and denied in part. A separate Order follows.


 July 17, 2018                                            _____/s/_____
Date                                                     Ellen L. Hollander
                                                         United States District Judge