IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JASAAN ALLAH QIYDAAR            *

    Plaintiff            *

    v.            *            CIVIL NO.  ELH-17-1622

PEOPLE ENCOURAGING PEOPLE, INC.            *

    Defendant            *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM**

In this employment discrimination case, the self-represented plaintiff, Jasaan Allah Qiydaar, filed a "Motion For Judgement Notwithstanding The Verdict And As A Matter Of Law." ECF 73 (the "JNOV Motion).  The JNOV Motion was filed on March 29, 2021, pursuant to Fed. R. Civ. P. 50(b).  A few weeks later, on April 23, 2021, plaintiff filed a "Motion For A New Trial" under Rules 50 and 59 of the Federal Rules of Civil Procedure.  ECF 86 ("New Trial Motion").

The motions followed a trial by jury that commenced on March 23, 2021, and concluded on March 26, 2021.  Plaintiff, a former employee of defendant People Encouraging People, Inc. ("PEP"), filed suit against PEP under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").  The case proceeded to trial on the claim that plaintiff was wrongfully terminated in retaliation for engaging in protected activity.  Plaintiff was the only witness for his version of events.  His contentions were disputed by two defense witnesses.  Both sides also submitted several exhibits.  The jury found in favor of PEP.

In the JNOV Motion, plaintiff asserts that "the preponderance of evidence Plaintiff presented at trial is sufficient as a matter of law to support reversing the jury's verdict for defendant."  ECF 73 at 1.  In his view, the jury's verdict was not consistent with the evidence, was

not supported by the law, and is "not in the interest of justice." *Id.*  With respect to the New Trial Motion, plaintiff argues, *inter alia*, that the "jury's verdict is contrary to the weight of Plaintiff's evidence and is thus, not in the interest of justice."  ECF 86 at 1.  Plaintiff points to the evidence that he believes justified a jury finding in his favor.

PEP opposes the JNOV Motion (ECF 85) and the New Trial Motion (ECF 87).  No replies were filed, and the time to do so has expired.

No hearing is needed to resolve the motions.  Local Rule 105.6.  For the reasons that follow, I shall deny the motions.

## Factual Background[1]

## I.

Qiydaar is an African-American resident of Baltimore who was employed by PEP from May 2015 to May 2016.  PEP is a privately owned non-profit behavioral healthcare corporation based in Baltimore, which provides rehabilitation and support services to disadvantaged and disabled individuals at various locations throughout Maryland.  Plaintiff worked primarily as a TAY Community Integration Specialist.[2]  He was located at PEP's office at Clipper Park Road in Baltimore.[3]

Relations between Qiydaar and PEP became strained over time.  The tension came to a head during a staff meeting held on March 16, 2016. The parties disputed the specifics of what occurred at that meeting.

---

[1] The Court does not have access to the trial transcript.  Therefore, I have relied on my notes from the trial and the pertinent portions of the factual background contained in my Memorandum Opinion of July 17, 2018.  ECF 22.

[2] "TAY" is an abbreviation for PEP's Transitional Age Youth program.

[3] The location was also identified at trial as "Primrose."

At the staff meeting, Terry Bennington, PEP's Director of Human Resources, discussed the new policy that PEP had implemented in February 2016 to track employees' schedules. In particular, PEP formulated a policy requiring employees to submit detailed schedules for each upcoming week. Bennington testified that the policy was devised for business reasons, not pertinent here. She also said that employees were informed of the reporting requirements in February 2016.

At the meeting, in response to a general inquiry for help on a particular task, Qiydaar apparently said he was not available to help with a particular task, but would not provide a reason. In response, Katie Glen,[4] a white co-worker, cursed at plaintiff, saying words to the effect: "That's bullshit." Qiydaar was offended; he believed Glen had been disrespectful to him.

Qiydaar complained to Bennington, but was not satisfied with her response. In his view, Bennington did not properly punish Ms. Glen. Moreover, he wanted Ms. Glen to apologize to him for what he claimed was a verbal assault. Plaintiff complained to PEP's Chief Executive Officer, Dale Meyer, via an email on March 17, 2016, alleging a hostile work environment.

Bennington testified that she conducted an investigation of the staff incident, in response to plaintiff's complaint. She also stated that she addressed the co-worker's use of profanity with the individual, but did she not find the outburst ("bullshit") to be discriminatory. Nor did she discern any disparate treatment.

On Thursday, March 24, 2016, Veronica Craig, an Intake Specialist at PEP, sent an email to numerous PEP employees, including Qiydaar, stating: "Please submit your weekly schedule for the week of March 28, 2016 by 5 pm Friday March 25, 2016. The schedule should include all

---

[4] The  spelling of the surname appears as "Glen" and "Glenn."  *See*, *e.g.,* ECF 44 at 4 ("Glenn") and *id.* at 5 ("Glen").

client appointments, home visits, transportation schedules and any other times you are away from the building." Qiydaar did not immediately respond, because he thought the request did not apply to him, as he was not a Case Manager. He also claimed that he did not know about the new policy that required his response.

Qiydaar took approved leave on Thursday, March 24, 2016 and Friday, March 25, 2016. He was celebrating his wedding anniversary.

Plaintiff returned to work on Monday, March 28, 2016, and, having heard nothing from Meyer about his complaint concerning Glen, he submitted a formal incident report regarding the March 16th incident. The incident report stated: "On Wednesday, March 16, 2016 I was verbally harassed and assaulted by Katie Glenn at our regularly scheduled TAY team meeting. During my conversation with another colleague (Lisa Meyer Coco), Ms. Glen inserted herself into the discussion. Ms. Glen was very aggressive and used profanity when she addressed me."

Craig sent an email to Qiydaar and two other individuals on Tuesday, March 29, 2016, stating: "Please submit your detailed schedule for this week to me by 12 noon today." Qiydaar did not submit his schedule, however. He claims he failed to do so because he was out of his office for most of the day, due to work.

On Wednesday, March 30, 2016, still having heard nothing about his complaints concerning Glen, Qiydaar sent an email to Bennington, on which Meyer was copied.  Qiydaar complained about the lack of response to his disparate treatment claims and about what he believed to be the fabricated complaint that he had made another employee "uncomfortable."  Qiydaar requested a follow-up meeting to discuss his hostile work environment complaint, an unbiased investigation into the incident of March 16, and an apology from Glen because she had cursed at him.

4

Craig sent an email to Bennington on Thursday, March 31, 2016, stating: "Jasaan Qiydaar did not turn in his weekly schedule. I received schedules from everyone else."  Later that day, Craig sent an email to several individuals, including Qiydaar, stating: "Please submit your weekly schedule for the week of April 4, 2016 by noon Friday April 1, 2016."

At 5:44 p.m. on Friday, April 1, 2016, Qiydaar emailed his weekly schedule to Bennington. Qiydaar explained that he had been out of work on March 24th and 25th and offsite on March 29th, and claimed he had just received the most recent request for his schedule.  He expressed the belief that PEP was requesting his schedule and making it difficult to comply with the request as pretext to retaliate against him for complaining about the racially hostile work environment.

On Monday, April 4, 2016, Bennington sent Qiydaar an email stating that Qiydaar's failure to submit his weekly schedule as requested was "viewed as a refusal to provide it, constituting insubordination."  Bennington acknowledged that Qiydaar had sent her a schedule on Friday, April 1 at 5:44 P.M., along with excuses for the delay, but noted that the schedule was incomplete. *Id.* "In closing," Bennington stated:

> [B]y failing and refusing to provide your work schedule with dates, times, and client names of all appointments to me for two (2) months, you have been insubordinate. I have not asked you to do anything that your co-workers have not been asked to do, and have done. Because you have continued to be insubordinate despite numerous requests to comply, you are hereby suspended without pay until you provide me a complete and accurate schedule with time, date, and other needed client information.

According to plaintiff, beginning April 4, 2016, he repeatedly reached out to Bennington via text, asking her for updates on the status of his suspension. On Friday, April 8, Bennington finally responded, telling Qiydaar that his suspension would continue until she received the necessary information from plaintiff regarding his work schedule.  But, plaintiff claimed that he

sought clarification from Bennington as to the particular information that he needed to provide, and she did not respond.

On Sunday, April 17, 2016, Bennington finally informed Qiydaar that he needed to include client names on his schedule in order to be released from his suspension. Qiydaar claimed that as soon as Bennington related that information, he submitted an updated weekly schedule with client names.

Bennington sent Qiydaar a letter on Monday, April 18, 2016, notifying him that PEP was transferring him to a new position at a different office. It was about five miles away from his original office.  Bennington claimed that the new position was comparable to his old position and that plaintiff was to be paid the same salary and receive the same benefits. The letter stated: "This change is being made because of the insurgency you demonstrated while employed in the Transitional Age Youth program, having been unwilling to produce schedules required to track your activities."

According to Bennington, PEP decided to transfer plaintiff to a new position in order to give him another chance, and to give him a "fresh start."  She also claimed that PEP's goal was to keep plaintiff employed.

Qiydaar sent an email to Bennington on Friday, April 22, 2016, complaining about the transfer. He expressed the view that he was being transferred to a position that was not comparable to his prior position, in retaliation for complaining about the racially hostile work environment at PEP.  Moreover, in his view, the transfer constituted a demotion.

Further, plaintiff testified that PEP violated its stated "core values," which prioritize work/life balance, among other things.  According to the evidence, plaintiff often left work during lunch to eat with his daughter, and attempted to plan his day around having lunch with his child.

6

And, several days a week, he left work to pick up his children from school in the afternoons, because his office location was near their school.  He claimed that PEP knew from "day one" of the importance of family to him, and if he had to decide between his work and his children, that was contrary to PEP's core values.  Moreover, the transfer would impede his ability to eat lunch with his daughter or pick up his children from school, because of the location.

Bennington stated that PEP employees are ethnically very diverse.  And, she claimed that it is not a common practice for PEP employees to leave work almost every day to pick up their children from school.  In addition, she claimed plaintiff was aware of the obligation to provide his weekly schedule, which was implemented as a management tool.  Yet, he repeatedly failed to do so.

On Monday, April 25, 2016, Qiydaar reported for his first day of work at the new site. Qiydaar's supervisor at the new site, Shakena Doss Mabry, did not know plaintiff prior to his transfer to her unit.  He plaintiff learned that he would no longer be working with young adults. That day, plaintiff left work after lunch and did not return.

Ms. Mabry issued a written Disciplinary Notice to Qiydaar for leaving work without permission and failing to return.  In response, Qiydaar explained: "I left for lunch, ran an important errand, then went and picked up my children. I had every intention of getting back to the site, but time did not permit."

The next day, Qiydaar reported to work but left, claiming he was sick. He did not return to work on Tuesday, April 26, 2016.  On Wednesday, April 27, Qiydaar called Mabry to inform her that he was still sick.  In response, Mabry informed Qiydaar that he needed to provide a doctor's note if he planned to be out sick beyond the next day.  Qiydaar called out sick for the rest of the week, without a doctor's note.

7

On Friday, April 29, 2016, Mabry informed Bennington and Meyer via email: "Jasaan called out sick today. This is day 4. He is aware he needs a doctor's note to return. I asked him if he had an ETA of when he will return. He stated that he does not have an ETA of when he will return however he will keep me posted."

Qiydaar called out sick again on Monday, May 2, May 3 and May 4, 2016.  Mabry informed Bennington and Meyer.

Plaintiff introduced PEP's sick leave policy.  He claimed a doctor's note was not required under PEP's policy.  But, Bennington claimed that employees are informed of the requirement at orientation.  And, according to the defense, other PEP employees had been terminated for failure to provide doctor's notes.

Qiydaar claimed that he did not have a personal physician.  But, he told Mabry he had a doctor's appointment scheduled for Tuesday, May 10 and that he would keep her updated in the meantime.  In the interim, on May 5, 2016, Qiydaar was notified by Bennington that he was being discharged, effective the next day, based on his extended unexcused absence. The termination letter stated, in part:

> You have not worked since April 26, 2016 at which time you stated that you could not work due to illness. Your supervisor on April 28, 2016 requested a doctor's note for your absence and an expected return date. As of today May 5, 2016, you have still not provided a return date nor have you provided a doctor's note, as requested several times. Under Company policy, employees who are out due to illness for more than three days are required to provide a doctor's note to justify the absence.

## II. Discussion

### A.

As to the JNOV Motion, Rules 50(a) and (b) of the Federal Rules of Civil Procedure are pertinent.

Under Rule 50(a), a party may submit a motion for judgment as a matter of law before the case is submitted to the jury, provided that the nonmoving party has been fully heard on the issue. Fed. R. Civ. P. 50(a); *Robinson v. Equifax Information Servs., LLC*, 560 F.3d 235, 240 (4th Cir. 2009).  "A trial court may grant judgment as a matter of law when it 'finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for' the non-moving party." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 292 (4th Cir. 2009) (quoting Fed. R. Civ. P. 50(a)(1)).

Judgment under Rule 50 is warranted "only 'if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof.'" *De Simone v. VSL Pharm., Inc.*, 395 F. Supp. 3d 617, 622 (D. Md. 2019) (quoting *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1249 (4th Cir. 1996)), *aff'd sub nom. De Simone v. Alfasigma USA, Inc.*, No. 19-1731, 2021 WL 613697 (4th Cir. Feb. 17, 2021); *see Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 391 (4th Cir. 2014).  To avoid the burden of holding a new trial in the event that a Rule 50(a) motion is granted, but subsequently reversed on appeal, a district court is "encouraged" to exercise its discretion by deferring a Rule 50(a) motion, submitting the case to the jury, and then deciding the motion afterwards, should it be renewed.  *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006).

In determining whether the nonmoving party has carried its burden as a matter of law, the district court "may not substitute [its] judgment for that of the jury or make credibility determinations." *Price*, 93 F.3d at 1249.  Instead, the court must "view the evidence in the light most favorable to the non-moving party and draw legitimate inferences in its favor." *Anheuser-Busch, Inc.* v. *L & L Wings, Inc.,* 962 F. 2d 316, 318 (4th Cir. 1992). Thus, if there is any evidence on which a reasonable jury could return a verdict in favor of the nonmoving party, the court must deny a Rule 50 motion. *Price,* 93 F.3d at 1249-50.

Under Fed. R. Civ. P. 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Following entry of the jury's verdict, "the movant may file a renewed motion for judgment as a matter of law," governed by the standard set forth in Rule 50(a). *Id.*

Plaintiff never moved for judgment under Rule 50(a). Therefore, he cannot renew such a motion under Rule 50(b). In other words, "a Rule 50(a) motion is a prerequisite to a Rule 50(b) motion . . . ." *Price*, 93 F.3d at 1249. But, even assuming a Rule 50(b) motion is proper, there is no basis for relief.

As indicated, the court views the evidence in the light most favorable to the prevailing party, without weighing the evidence or "assessing the credibility of any witnesses." *Ward v. AutoZoner, LLC*, 958 F.3d 254, 263 (4th Cir. 2020); *see Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 196 (4th Cir. 2017). Notably, if "reasonable minds could differ" as to the findings of the jury, then the court should deny the motion. *Bresler*, 855 F.3d at 196. The task of the court, then, is to determine whether "the evidence presented, combined with all permissible inferences . . . provide[s] a legally sufficient basis for a reasonable to jury to find" in favor of the nonmoving party. *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 244 (4th Cir. 2020) (brackets added).

The Supreme Court has recently instructed that, "in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record," and not limit its review to the evidence favoring the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* The Court underscored that credibility determinations, the weighing of evidence,

and the drawing of reasonable inferences are for the jury.  *Id.*; *see also Fontenot v. Taser Intern., Inc.*, 736 F.3d 318, 331 (4th Cir. 2013); *De Simone*, 395 F. Supp. 3d at 622 (stating that the district court "'may not substitute [its] judgment for that of the jury or make credibility determinations'") (quoting *Price*, 93 F.3d at 1249) (brackets in *De Simone*).

### B.

Rule 50(b) notes that a party "may include an alternative or joint request for a new trial under Rule 59."  I turn to the New Trial Motion.

"The standard for granting a Rule 59 motion, while permitting the court to assess credibility, is still a high bar."  *Burkhart v. Dickel*, CCB-12-3320, 2017 WL 5635445, at *1 (D. Md. Jan 3, 2017).  Under Rule 59, a district court may set aside a verdict and grant a new trial under the following circumstances: "if (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014); *see Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998); *Chesapeake Paper Prods. Co.* v. *Stone* & *Webster Eng'g Corp.*, 51 F.3d 1229, 1237 (4th Cir. 1995).

In making its determination, "a trial judge may weigh the evidence and consider the credibility of the witnesses," and may set aside the verdict, "even if supported by substantial evidence." *Poynter By Poynter* v. *Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989). However, whether to grant or deny a Rule 59 motion is a matter generally committed to the court's sound discretion. *Chesapeake Paper Prods.*, 51 F.3d at 1237.

Notably, "a motion for a new trial should not be granted ... where the moving party has failed to timely object to the alleged impropriety giving rise to the motion." *Dennis* v. *Gen. Elec.*

*Corp.,* 762 F.2d 365, 367 (4th Cir. 1985); *see De Simone*, 395 F. Supp. 3d at 636. A Rule 59 motion may not be used "to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker,* 554 U.S.471-485 n.5 (2008); *see Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir. 1998).  Moreover, Rule 59 is not a vehicle to relitigate issues that were previously decided. *Delong v. Taylor*, 790 F. Supp. 594, 618 (E.D. Va. 1991).  In this case, plaintiff does not point to any mistakes, other than his belief that the outcome itself was a mistake.

Certainly, a court is not a "rubber stamp" regarding a jury verdict. *Price*, 93 F.3d at 1250. It has "a duty to reverse the jury verdict[] if the evidence cannot support it." *Id.*  This is not such a case, however.   In this case, the jury was presented with conflicting testimony.  And, the jury was entitled to resolve the conflicts in favor of PEP.

### III.    Conclusion

To be sure, the jury could have reached a verdict in plaintiff's favor.  But, there was ample evidence supporting the verdict in favor of the defendant.  The jurors, consisting of nine U.S. citizens, were not required to believe plaintiff's version of events, which was contradicted by two defense witnesses.

In sum, plaintiff has failed to assert any basis for this court to disturb the verdict reached by the jury.  *See Ward,* 958 F.3d at 263; *Bresler*, 855 F.3d at 196.

An Order follows.

Date:   June 3, 2021                                    _____/s/_____
                                                        Ellen L. Hollander
                                                        United States District Judge